## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JONATHON O. DOWD, as father and administrator of the estate of JONATHON B. DOWD, deceased, Plaintiff, <br><br> v. <br><br> CITY OF PHILADELPHIA; OFFICER DANIEL MITCHELL, individually; OFFICER LINDSAY MOORE, individually; SIMON CHERNOV, individually, AND BERNARD BAKER, individually. Defendants. | Civil Action No.: 21-cv-01945 <br><br> JURY TRIAL DEMANDED <br><br> ELECTRONICALLY FILED |

## AMENDED COMPLAINT

Plaintiff Jonathon O. Dowd, father and personal representative of the estate of decedent Jonathon B. Dowd, alleges as follows:

### I.    PRELIMINARY STATEMENT

1.    This is a civil rights survival and wrongful death action brought under 42 U.S.C. § 1983 and raising supplemental state-law claims concerning the brutal violent acts inflicted upon Plaintiff's decedent, Jonathon B. Dowd ("Dowd'), by Defendants.  Dowd was disoriented and confused due to receiving an injection of Naloxone when a Philadelphia Police Officer struck him in the face and head with a closed fist at least three times, resulting in his death.  Plaintiff Jonathan O. Dowd

seeks on behalf of his son's estate and heirs, damages for the substantial pain and suffering, financial losses and loss of life caused by the Defendants' conduct.

## II.    JURISDICTION AND VENUE

2.    This action arises under the United States Constitution, particularly under the Fourth and Fourteenth Amendments.  The action seeks claims under 42 U.S.C. § 1983.

3.    This Honorable Court has jurisdiction pursuant to 28 U.S.C. § 1331 and 13 U.S.C. § 1343.

4.    This action asserts pendent claims under Pennsylvania law.  This Court has supplemental jurisdiction over such claims pursuant to 28 U.S.C. § 1367.

5.    Venue is proper in the Eastern District of Pennsylvania pursuant to 28 U.S.C. §1391 in that the events complained of herein occurred in the City of Philadelphia, in the Commonwealth of Pennsylvania, and the above-captioned Defendants reside or have places of business within the boundaries of the Eastern District of Pennsylvania.

## III.   PARTIES

6.    Plaintiff Jonathon O. Dowd is a resident of Pocasset, Massachusetts. He is the father and Personal Representative of Dowd's Estate.  (A true and correct copy of the Letters of Authority for the Estate of Jonathon B. Dowd is attached as Exhibit A.)

7.     Dowd was, at the time of his death on February 12, 2020, a 28-year-old male and a resident of Biddeford, Maine.

8.     Defendant City of Philadelphia ("Defendant City") is a City in the Commonwealth of Pennsylvania with a central business office located at City Hall, 1400 John F. Kennedy Blvd., Philadelphia, PA 19107.  The City of Philadelphia operates the Philadelphia Police Department and Philadelphia Fire Departments and employs the individual Defendants.

9.     At all times relevant to this Complaint, Defendant Officer Daniel Mitchell ("Officer Mitchell") was a police officer of the Philadelphia Police Department, 35th Police District, and an employee of Defendant City.

10.     At all times relevant to this Complaint, Officer Mitchell was acting under color of state law.

11.     At all times relevant to this Complaint, Defendant Officer Lindsay Moore ("Officer Moore") was a police officer of the Philadelphia Police Department, 35th Police District, and an employee of Defendant City.

12.     At all times relevant to this Complaint, Officer Moore was acting under color of state law.

13.     At all times relevant to this Complaint, Defendant Simon Chernov ("Chernov") was a medic for the Philadelphia Fire Department, and an employee of Defendant City.

3

14.     At all times relevant to this Complaint, Chernov was acting under color of state law.

15.     At all times relevant to this Complaint, Defendant Bernard Baker ("Baker") was a medic for the Philadelphia Fire Department, and an employee of Defendant City.

16.     At all times relevant to this Complaint, Baker was acting under color of state law.

17.     All Defendants acted in concert and conspiracy and were jointly and severally responsible for the harms caused to Plaintiff.

## IV.   STATEMENT OF FACTS

18.     Dowd arrived in Philadelphia by train on the afternoon of February 12, 2020.

19.     Dowd worked for Kimball and Sons Tree Services, a corporation registered in Maine, that had a contract to remove trees in Pennsylvania.

20.     Joshua Shumacher ("Shumacher"), a coworker of Dowd's at Kimball and Sons Tree Services, met Dowd at the 30th Street Station in Philadelphia, PA. He intended to drive Dowd to their shared hotel room.

21.     Prior to arriving at their hotel, the two young men decided to go to a local Chinese food restaurant. Only Dowd entered the restaurant.

22.     Soon thereafter, Shumacher recognized that Dowd was in distress and that he may be experiencing an opioid overdose.

23.     Shumacher was not from Philadelphia and did not know the location of the nearest hospital.

24.     Not knowing where else to go, Shumacher stopped at a Rite Aid Pharmacy located at the 4600 block of North Broad Street in Philadelphia.

25.     Shumacher rushed into the Rite Aid Pharmacy and sought assistance.

26.     Naloxone is a medication that can be used to reverse the effects of an opiate overdose. Specifically, it displaces opioids from the receptors in the brain that control the central nervous and respiratory system.

27.     Pursuant to Pennsylvania Department of State Standing Order DOH-002-2018, residents of the Commonwealth of Pennsylvania can obtain Naloxone without a prescription. The Standing Order authorizes pharmacist to dispense and administer Naloxone to individuals suspected of opioid overdose. (A true and correct copy of Standing Order DOH-002-2018 is attached as Exhibit B.)

28.     A pharmacist named Angel Mody responded to Shumacher's request for assistance. Ms. Mody observed that Dowd was possibly overdosing on opioids and called 911 seeking assistance. She then administered two doses of Naloxone to Dowd.

29.     After receiving Naloxone from Ms. Mody, Dowd predictably became disoriented and agitated.

30.     The Pennsylvania Department of Health advises that "persons who may be chronically taking opioids are more likely to experience adverse reactions from Naloxone." The Pennsylvania Department of Health further warns that "after administration, [individuals] may awaken disoriented. Being disoriented can sometimes lead to combative behavior, especially if Naloxone is given by someone unfamiliar."

31.     The Philadelphia Police Department issued Directive 4.22 on Naloxone in 2015. The Directive states that "complainants who are revived from an opioid overdose may regain consciousness in an agitated and combative state and may exhibit symptoms associated with withdrawal." (A true and correct copy of Directive 4.22 is attached as Exhibit C.)

32.     At approximately 5:20 p.m., police officers arrived at the scene.

33.     Dowd was lying on the ground at the time Officers Mitchell and Moore (together "Defendants Officers") arrived. Upon seeing Defendants Officers' vehicle lights, Dowd stood up and started to speak mostly unintelligible words.

34.     Officer Mitchell shouted directions at Dowd.

35.     Dowd then began to walk in the general direction of Defendant Officers.

36.     Dowd was 5'10" tall and weighed 151 pounds.

37.     When Dowd walked in the general area of Defendants Officers, Officer Mitchell threw Dowd to the pavement face-first and began to wrestle with Dowd.

38.     Officer Moore assisted Officer Mitchell wrestle Dowd on the ground.

39.     At the same time, Officer Mitchell's former partner, Retired Officer Leonardo Guerrero, just so happened to be shopping at the same Rite Aid store. Upon witnesses the altercation, Mr. Guerrero intervened to assist Defendant Officers by holding Dowd in a prone position and into the pavement.

40.     Defendant Officers and Mr. Guerrero put Dowd into handcuffs.

41.     While handcuffed and lying prone on the ground, Dowd yelled to Defendants Officers that he could not breathe, that he wanted to die, and pleaded "help me daddy."

42.     Officer Mitchell viciously punched Dowd in the face and head at least three times with a closed fist.

43.     Around this time, Chernov and Baker from the Philadelphia Fire Department arrived on the scene with an ambulance.  Two other officers also arrived at the scene.

44.     Defendant Officers, Chernov and Baker placed Dowd on a stretcher in a prone position and moved him into the ambulance.

45.     Dowd began to moan in pain.  Chernov mocked Dowd's moaning sounds to Officer Mitchell.

46.     Dowd began to calm down and the ambulance left the scene in route to Albert Einstein Medical Center in Philadelphia, PA.  Officer Mitchell traveled to Albert Einstein Medical Center in the back of the ambulance.

47.     Baker drove the ambulance to Albert Einstein Medical Center while Chernov remained in the rear with Dowd and Officer Mitchell.  Dowd was restrained in the ambulance and lying in a prone position.

48.     The Pennsylvania Department of Health has issued protocols governing emergency medical providers that strictly forbids transporting patients in a prone position.  (A true and correct copy of portions of the Statewide Basic Life Support Protocols is attached as Exhibit D.)

49.     All Philadelphia Fire Department employees, including Chernov and Baker, are trained to not transport patients in a prone position.

50.     While in route to Albert Einstein Medical Center, Dowd went unconscious.  A paramedic turned Dowd into a supine position and administered CPR.

51.     The paramedics' efforts were in vain, and Dowd remained unresponsive.

52.     Upon arrival at Albert Einstein Medical Center, doctors attempted to resuscitate Dowd.

53.     Dowd died in the ambulance on his way to Albert Einstein Medical Center.  Dowd was pronounced dead by Dr. Shawn Sethi in the Albert Einstein Medical Center's Emergency Room at 5:58 pm.

54.     Dowd died due to Defendants' unlawful conduct.

55.     Defendant City has provided some training to some officers on the use and likely effects of Naloxone.  It has not provided such training to all police officers, including Defendants Officers.

56.     Defendants Officers continue to work for Defendant City.   Officer Mitchell was cited by the Philadelphia Police Department Internal Affairs Division for striking Dowd in the head and face.  According to Defendant City's policies, Officer Mitchell should have used his electronic control weapon to subdue Dowd instead of punching him in the head and face.

## V.     WRONGFUL DEATH AND SURVIVAL ACTIONS

57.     Plaintiff brings this action on behalf of Dowd's heir under the Pennsylvania Wrongful Death Act, 42 Pa. C.S. § 8301.

58.     Dowd's heir under the Wrongful Death Act is his father, Jonathon O. Dowd, of Pocasset, Massachusetts.

59. Dowd was unable and did not bring an action against the Defendants for damages during his lifetime.

60. As a direct and proximate result of Defendants' actions, Dowd's heir suffered pecuniary loss, the expense of Dowd's hospital, funeral and burial, and the costs of administering Dowd's estate. As a direct and proximate result of Defendants' actions, Dowd's heir has suffered further pecuniary loss including but not limited to expected services, society, and comfort that would have been given to him had Dowd lived, including but not limited to, provision of physical comforts and services and provision of society, companionship and comfort, provision of a portion of Dowd's for his care, needs, and support, for which damages are claimed.

61. Plaintiff also brings this action on the behalf of the Estate of Dowd under the Pennsylvania Survival Statute, 42 Pa. C.S. § 8302, under which, all claims Dowd would have been able to bring had he survived, may be brought by his estate.

62. As a direct and proximate result of Defendants' actions, Dowd suffered extreme physical pain before his death, and as a result of his death, suffered complete loss of earnings and earnings capacity.

63. Plaintiff seeks damages for these harms.

## VI.   CAUSES OF ACTION

### COUNT I:  VIOLATION OF THE FOURTH AMENDMENT FOR EXCESSIVE FORCE RESULTING IN DEATH
### 42 U.S.C. § 1983
### (Plaintiff v. Defendants Officers)

64.     All proceeding paragraphs are incorporated as if fully set forth herein.

65.     The Fourth Amendment to the United States Constitution, made applicable to the States by the Fourteenth Amendment of the same, protects individuals from unreasonable searches and seizures.

66.      The Fourth Amendment prohibits apprehension by the use of deadly force by officers unless such force "is necessary to prevent the escape and the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others."  Tennessee v. Garner, 471 U.S. 1, 3 (1985).

67.     Officer Mitchell seized Dowd.  After Dowd was seized and handcuffed, Officer Mitchell repeatedly struck Dowd in the face and head, causing his death.

68.     Officer Moore held Dowd to the ground while Officer Mitchell viciously assaulted Dowd.  As such, Defendant Officers acted in concert.

69.     As a direct and proximate result of Defendants Officers' conduct, Dowd was killed, and Plaintiff suffered severe damages.

70.     Defendants Officers exhibited reckless and callous indifference to Dowd's federally protected rights.

## COUNT II: VIOLATION OF THE FOURTH AMENDMENT FOR FAILURE TO INTERVENE
### 42 U.S.C. § 1983
### (Plaintiff v. Officer Moore)

71.　All proceeding paragraphs are incorporated as if fully set forth herein.

72.　Police officers have a duty to "take reasonable steps to protect a victim from another officer's use of excessive force" if "there is a realistic and reasonable opportunity to intervene." Smith v. Mensinger, 293 F.3d 641, 650 (3d Cir. 2002).

73.　Officer Moore witnessed Officer Mitchell violate the Fourth Amendment when he used excessive force on Dowd.

74.　Officer Moore was near Officer Mitchell when he threw Dowd to the pavement.

75.　Officer Moore was within two or three feet of Officer Mitchell when she witnessed Officer Mitchell punch Dowd in the face and head at least three times with a closed fist.

76.　Officer Moore had a duty to protect Dowd from Officer Mitchell's callous and wanton use of violence.  Instead of intervening and stopping Officer Mitchell, Officer Moore continued to restrain Dowd while he was repeatedly assaulted.

77.　As a direct and proximate result of Officer Mitchell's failure to intervene, Dowd was killed, and Plaintiff suffered severe damages.

## COUNT III: VIOLATION OF THE FOURTH AMENDMENT FOR FAILURE TO TRAIN EXHIBITING DELIBERATE INDIFFERENCE
## 42 U.S.C. § 1983
### (Plaintiff v. Defendant City)

78.     All proceeding paragraphs are incorporated as if fully set forth herein.

79.     Policymakers for Defendant City know that its police officers will confront individuals suffering from the effects of Naloxone.

80.     Policymakers for Defendant City understand that police officers that confront individuals in an agitated and confrontational state caused by the administration of Naloxone face a difficult set of choices, and that the wrong choice in such situations will frequently lead to constitutional deprivations.

81.     Since the national opioid crisis began to rage in Philadelphia, officers of Defendant City have frequently mishandled situations involving opioid overdose and the use of Naloxone.

82.     Due to this history and the difficult set of choices faced by police officers, Defendant City promulgated policies and directives involving the use of force and the administration of Naloxone.

83.     Notwithstanding the existence of policies and directives, Defendant City has failed to adequately train police officers on such policies.

84.     Defendant City's failure to train Defendants Officers on the proper use of force in situations of opioid overdose involving Naloxone was deliberately

indifferent to the rights of the people and the moving force behind Plaintiff's deprivations.

85.     Defendant City's failure to train Defendant Officers was the moving force behind Dowd's death and the harm to Plaintiff.

## COUNT IV:  ASSAULT AND BATTERY
### Pennsylvania Common Law
### (Plaintiff v. Defendants Officers)

86.     All proceeding paragraphs are incorporated as if fully set forth herein.

87.     By causing imminent apprehension of harm, and by throwing Dowd to the ground face-first, and striking Dowd in the face and head at least three times with closed fists, Defendants Officers intended to cause Dowd harm and committed the torts of assault and battery under Pennsylvania law.

88.     Defendants Officers' use of force was unreasonable and excessive under the circumstances.

89.     Defendants Officers' conduct constitutes a crime, actual malice, and willful misconduct as those terms are used in the Pennsylvania Political Subdivision Tort Claims Act.  42 Pa. C.S. § 8542(a)(2).

90.     As a direct and proximate result of Defendants Officers conduct, Dowd was killed, and Plaintiff suffered damages.

**COUNT V:  VIOLATION OF SUBSTANTIVE DUE PROCESS CLAUSE OF
FOURTEENTH AMENDMENT
42 U.S.C. § 1983
(Plaintiff v. Defendants Chernov and Baker)**

91.     All proceeding paragraphs are incorporated as if fully set forth herein.

92.     The Substantive Due Process Clause of the Fourteenth Amendment to the United States Constitution protects individual rights that are implicit in the concept of ordered liberty.  Of those rights protected by the Substantive Due Process Clause is the right to life.

93.     Once Dowd was placed in the ambulance, Chernov and Baker were responsible for his health and care.

94.     Chernov and Baker were aware when they took responsibility for Dowd that his condition was precarious.

95.     By transporting Dowd to Albert Einstein Medical Center in a prone position, Chernov and Baker inflicted harm upon Dowd that was direct and foreseeable.

96.     Chernov and Baker were aware of the state-wide prohibition on transporting patients in a prone position and willfully disregarded the rule in a manner that "shocks the conscience."

97.     Chernov and Baker utilized their authority to put Dowd in a position that was worse than if they did not act at all.

98.     Chernov and Baker's acts violated Dowd's substantive due process right to life.

99.     As a direct and proximate result of Chernov and Baker's conduct, Dowd was killed, and Plaintiff suffered damages.

### COUNT VI:  WILLFUL MISCONDUCT
### Pennsylvania Common Law
### (Plaintiff v. Defendants Chernov and Baker)

100.    All proceeding paragraphs are incorporated as if fully set forth herein.

101.    Chernov and Baker restrained Dowd in a prone position while transporting him to the hospital.

102.    Chernov and Baker were trained to never transport patients in a prone position.  Chernov and Baker knew the dangers associated with transporting patients in a prone position and understood that harm was substantially certain to ensue.

103.    By transporting Dowd in a prone position, Chernov and Baker committed willful misconduct within the meaning of the Pennsylvania Political Subdivision Tort Claims Act.  42 Pa. C.S. § 8542(a)(2).

104.    Chernov and Baker's decision to transport Dowd in a prone position contributed to his death, and caused damages to Plaintiff.

## RELIEF REQUESTED

**WHEREFORE**, Plaintiff requests this Court to enter judgment in their favor and against Defendants and requests that this Court:

a)     Award traditional tort remedies such as compensatory damages against all Defendants;

b)     Award such punitive damages against the Defendant Officers;

c)     Award prevailing party attorney's fees and costs pursuant to 42 U.S.C. § 1988(b);

d)     Award pre- and post-judgment interest at the lawful rate; and

e)     Other relief that the Court deems just and proper under either law or equity.

## DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demand a trial by jury with respect to the claims and relief set forth herein.

Respectfully submitted,

Dated: July 14, 2021

*/s/ Adam T. Wolfe*
Adam T. Wolfe, Esquire
Pa. I.D. # 201057
Shollenberger Januzzi & Wolfe, LLP
2225 Millennium Way
Enola, PA 17025
awolfe@sjwlaw.com
Tel: (717) 728-3200

17

Fax: (717) 728-3400
*Counsel for Plaintiff*


 */s/ Scott P. Stedjan*
Scott P. Stedjan, Esquire
Pa. I.D. # 318851
Killian & Gephart, LLP
218 Pine Street,
Harrisburg, PA 17101
sstedjan@killiangephart.com
Tel: (717) 232-1851
Fax: (717) 238-0592
*Counsel for Plaintiff*

18

# EXHIBIT A

DE-404
(Rev. 07/01/19)
Page 1 of 1

# STATE OF MAINE

_____ YORK _____ COUNTY PROBATE COURT          DOCKET NO. __2021-0295__

Estate of _____ Jonathan B. Dowd _____          LETTERS OF AUTHORITY OF
                    Decedent                      PERSONAL REPRESENTATIVE

TO:      _____ Jonathan O. Dowd _____

         _____ 871 Shore Rd #3E _____
         _____ Pocasset, MA 02559 _____
         (Name and mailing address)

          You have been appointed PERSONAL REPRESENTATIVE of the Estate of _Jonathan B. Dowd_, who
died on _12th_ day of _February_____, 2020, domiciled at _____Biddeford, Maine_____.

          The Decedent (check a or b):                    ┌─────────────────────────────┐
                                                          │ If "Supervised," stamp or   │
          ☐ (a) Left a Will                               │ write in here:              │
                                                          │                             │
          ☒ (b) Left no Will                              │                             │
                                                          └─────────────────────────────┘

          You are to administer the Estate according to law.  If the Decedent left a Will, your powers may be
restricted by the provisions of the Will.  If these letters are marked "SUPERVISED" in the box above, your powers
are restricted according to law and as the Court may have ordered.

          During the course of your administration, you must give heed to any proceedings in this Court which may
affect your rights and duties as Personal Representative.  In particular, if a petition is filed requesting that this Estate
be placed under supervised administration, you shall not exercise your power to distribute any assets of the Estate
until further notice from this Court.[1]

          You must, regardless of other proceedings:

          1. Notify all heirs, devisees and other persons entitled to notice of your appointment no later than 30 days
after your appointment.  See 18-C M.R.S. §3-705 and Maine Probate Form N-115.

          2. Prepare an inventory of the assets of the Estate within three months after your appointment and furnish
it to any interested persons who request it.  See 18-C M.R.S. §3-706 and Maine Probate Form DE-405.

          Your letter of acceptance of this position and trust was received on _____3/15/2021_____,
and is conclusive evidence of your acceptance of your fiduciary obligations.  You may be held personally liable for
any violation of your duties under law with respect to the position you have accepted.

Dated: _March 31st, 2021_____

                                                   _____
                                                   Deputy Register of Probate

[1] 18-C M.R.S. § 3-503(3)

MARP

Form A
(Rev. 09/12/19)
Page 1 of 1

# STATE OF MAINE

Docket ___2021-0295___

<u>YORK</u> COUNTY                          REGISTRY OF PROBATE

  I,_Casey W. Hartford,_ Deputy Register of the Probate Court for said County of York hereby certify, that on the _thirty-first_ day of _March_ ,

_2021_ , _Jonathan O. Dowd of Pocasset, Massachusetts_ was duly appointed _Personal Representative_ of the estate of _Jonathan B. Dowd_ late of _Biddeford, Maine,_ intestate, without bond, according to law.

  I also certify, that it appears by the records and files of said Court that said appointment has not been revoked or annulled.



In Witness Whereof, I have hereunto set my hand and affixed the Official Seal of said Court, this

_31st_ day of _March,_ _2021_.

_____
Deputy Register of Probate

MARP

DE-102(I)
(Rev. 07/01/19)
Page 1 of 1

**L.S.**

# STATE OF MAINE

_____York_____ COUNTY PROBATE COURT      DOCKET NO. ___2021-0295___

Estate of _____Jonathan B. Dowd_____      INFORMAL APPOINTMENT OF
                        Decedent                PERSONAL REPRESENTATIVE FOR
                                                INTESTATE DECEDENT: FINDINGS OF
                                                REGISTER AND APPOINTMENT

Acting under the requirements of Title 18-C M.R.S. § 3-308 and pursuant to an Application by
Jonathan O. Dowd _____, I find, based exclusively on the information in the Application, that:

1.  The Application is complete;

2.  The Applicant has affirmed that the statements contained in the application are true to the best of the Applicant's knowledge and belief;

3.  The Applicant appears to be an interested person as defined in Title 18-C M.R.S. § 1-201 (20);

4.  Venue is proper;

5.  No Will was presented with the Application for appointment, or, any Will to which the requested appointment relates has been formally or informally probated;

6.  Any notice required pursuant to Title 18-C M.R.S. §3-308(F) will be or has been given.

7.  The Applicant requests that Jonathan O. Dowd _____ be appointed Personal Representative.

8.  The person listed in the foregoing paragraph 7 has priority entitling the person to appointment;

9.  No Personal Representative has been appointed in this or another county of this state under the currently authorized assumption concerning testacy except (if none, enter "None") NONE _____, who filed a written statement of resignation as provided in Title 18-C M.R.S. § 3-610 (3) on NONE _____;

10. The Decedent was domiciled in this state or, if domiciled elsewhere, the Decedent had no domiciliary Personal Representative whose appointment has not been terminated except (if none, enter "None") NONE _____ who, or whose nominee, is this Applicant.

Wherefore, I make the appointment requested.

Dated: ___March 31, 2021___

_____
Deputy Register of Probate

MARP

N-114
(Rev. 07/01/19)
Page 1 of 1

# STATE OF MAINE

___YORK___   COUNTY PROBATE COURT   DOCKET___ 2021-0295 _____

Estate of ____Jonathan B. Dowd_____
　　　　　　　　　Decedent

NOTICE TO PERSONAL
REPRESENTATIVE RE:
APPOINTMENT

　　　A petition or application has been filed in this Court requesting that you be appointed Personal Representative of this Estate.

　　　The Judge has made the findings required by law (18-C M.R.S. § 3-414) or the Register has made the findings required by law (18-C M.R.S. § 3-308) and you have been chosen to be appointed Personal Representative of this Estate.

## THIS IS NOT AN APPOINTMENT
## NOR LETTERS OF ANY AUTHORITY[1]

☒ (a) YOU ARE NOT REQUIRED TO FILE ANY BOND.

☐ (b) YOU MUST FILE THE FOLLOWING BOND
　　　　☐ (1) Personal Representative's Bond:[2] (Note: If item
　　　　　　　(b) (1) is checked, also check (i) or (ii)):
　　　　　　　☐ (i) A corporate surety bond is required
　　　　　　　☐ (ii) Personal sureties are acceptable
　　　　　　　Amount of the Personal Representative's Bond $ _____
　　　　☐ (2) An estate tax bond:[3] Amount $ _____

　　You may not exercise any authority as Personal Representative until any required bond is filed with the Court.

Date  3/31/2021

_____
Deputy Register of Probate

---

[1] 18-C M.R.S. §§ 3-601 and 3-602.
[2] 18-C M.R.S. §§ 3-603 and 3-606.
[3] 36 M.R.S. § 4079.

MARP

# EXHIBIT B

**STANDING ORDER DOH-002-2018**
Naloxone Prescription for Overdose Prevention

Naloxone Hydrochloride (Naloxone) is a medication indicated for reversal of a drug overdose that is the result of consumption or use of one or more opioid-related drugs causing a drug overdose event (opioid-related overdose).

## I. PURPOSE

This standing order is intended to ensure that residents of the Commonwealth of Pennsylvania who are at risk of experiencing an opioid-related overdose, or who are family members, friends or other persons who are in a position to assist a person at risk of experiencing an opioid-related overdose (Eligible Persons), are able to obtain Naloxone. Unless otherwise expressly permitted herein, this standing order is not intended to be used by organizations who employ or contract with medical staff who are authorized to write prescriptions. Such organizations should utilize the medical professionals with whom they have a relationship to write prescriptions specific to personnel who would be expected to administer Naloxone and would be wise to ensure that all such personnel are appropriately trained in the administration of Naloxone.

## II. AUTHORITY

This standing order is issued pursuant to Act 139 of 2014 (Act 139) (amending The Controlled Substance, Drug, Device and Cosmetic Act (35 P.S. §§ 780-101 et seq.)), which permits health care professionals otherwise authorized to prescribe Naloxone to prescribe it via standing order to Eligible Persons.

## III. AUTHORIZATION

**This standing order may be used by Eligible Persons as a prescription or third-party prescription to obtain Naloxone from a pharmacy in the event that they are unable to obtain Naloxone or a prescription for Naloxone from their regular health care providers or another source. This standing order is authorization for pharmacists to dispense Naloxone and devices for its administration SOLELY in the forms prescribed herein.**

**This standing order may also be used by community-based organizations (CBOs) that are in a position to assist a person at risk of experiencing an opioid-related overdose, to obtain Naloxone and provide it to individuals at risk of experiencing an opioid-related overdose, their family members and friends, or other persons in a position to assist a person at risk of experiencing an opioid-related overdose. CBOs may provide the Naloxone in person or via mail. This authorization is in no way intended to establish an agency relationship between CBOs operating under this standing order and the Department of Health (DOH).**

## IV. TRAINING AND INSTRUCTIONAL MATERIALS

Prior to obtaining Naloxone under this standing order, Eligible Persons are strongly advised to complete a training program approved by the DOH in consultation with the Pennsylvania Department of Drug and Alcohol Programs (DDAP), such as the one found online at Train PA's website (https://www.train.org/pa/admin/course/1085469/), and obtain a certificate of completion. Act 139 does not require training; however, training is necessary in order to ensure that Eligible Persons are protected from legal liability to the extent that Act 139 provides that the receipt of DOH/DDAP-approved training and instructional materials and prompt seeking of additional medical assistance creates a rebuttable presumption that an Eligible Person acted with reasonable care in administering Naloxone.

## V. SIGNS AND SYMPTOMS OF OPIOID OVERDOSE

1. A history of current narcotic or opioid use or fentanyl patches on skin or needle in the body.

2. Unresponsive or unconscious individuals.

3. Not breathing or slow/shallow respirations.

4. Snoring or gurgling sounds (due to partial upper airway obstruction).

5. Blue lips and/or nail beds.

6. Pinpoint pupils.

7. Clammy skin.

8. Note that individuals in cardiac arrest from all causes share many symptoms with someone with a narcotic overdose (unresponsiveness, not breathing, snoring/gurgling sounds, and blue skin/nail beds). If no pulse, these individuals are in cardiac arrest and require CPR.

## VI. APPROPRIATE USE AND DIRECTIONS

Eligible Persons should be aware of the following information when dealing with a person who is suspected of experiencing an opioid overdose event:

1. **Call 911 for EMS to be dispatched.**

2. In cardiac arrest or pulseless patients: Call 911 for EMS and start CPR if able and trained to do so. In cardiac arrest, CPR is the most important treatment, and any attempt to administer Naloxone should not interrupt chest compressions and rescue breathing.

3. Naloxone should only be given to someone suspected of opioid overdose as noted in the signs and symptoms listed in Section V above.

4. In respiratory arrest or in a non-breathing patient: If able to do rescue breathing, rescue breathing takes priority over Naloxone administration. Administer Naloxone if possible while doing rescue breathing.

5. Administration of Naloxone (only give to someone with suspected opioid overdose based on signs and symptoms listed in Section V above).

## A. INTRA-NASAL NALOXONE

### *Eligible Persons should be provided with the following:*

#### 1. Luer-lock syringes and mucosal atomization devices (MAD)

a. Two 2 mL Luer-Jet luer-lock syringes prefilled with Naloxone (concentration 1 mg/mL);

b. Two mucosal atomization devices;

c. Patient information pamphlet containing dosage and administration instructions.

#### 2. NARCAN Nasal Spray

a. Carton containing two blister packages each with single 4 mg dose of Naloxone in a 0.1 mL intranasal spray;

b. Package insert containing dosage and administration instructions.

### *Instructions for use:*

#### 1. Luer-lock syringes and mucosal atomization devices (MAD)

a. Pop off two yellow caps from the delivery syringe and one red cap from the naloxone vial.

b. Screw the Naloxone vial gently into the delivery syringe.

c. Screw the mucosal atomizer device onto the top of the syringe.

d. Spray half (1 ml) of the Naloxone in one nostril and the other half (1 ml) in the other nostril.

e. Note: Administer the Naloxone in a quick burst to ensure that it is atomized. A slow administration will cause liquid to trickle in without being atomized properly, which will slow delivery to the bloodstream.

f. Continue to monitor breathing and pulse. **IF NOT BREATHING**, **give rescue breathing.** **IF NO PULSE**, **start CPR, if able and trained to do so.**

g. If person does not awaken after 4 minutes, administer second dose of Naloxone (if available) one half (1 mL) briskly in one nostril and the other half (1 mL) briskly in the other nostril.

h. Remain with the person, monitor breathing and pulse, and provide rescue breathing or provide CPR if needed, until he or she is under care of a medical professional, such as a physician, nurse, or EMS.

## 2. NARCAN Nasal Spray

a. Lay person on their back to receive a dose of NARCAN Nasal Spray.

b. Remove NARCAN from the box. Peel back the tab with the circle to open the NARCAN Nasal Spray.

c. Hold the NARCAN Nasal Spray with your thumb on the bottom of the plunger and first and middle fingers on either side of the nozzle.

d. Tilt the person's head back and provide support under the neck with your hand. Gently insert tip of nozzle into one nostril until fingers on either side of the nozzle are against the bottom of the person's nose.

e. Press the plunger firmly to give the dose of NARCAN Nasal Spray.

f. Remove the NARCAN Nasal Spray from the nostril after giving the dose.

g. Move the person onto their side after giving NARCAN Nasal Spray.

h. Remain with the person, monitor breathing/pulse. **IF NOT BREATHING**, **give rescue breathing.** **IF NO PULSE**, **start CPR, if able and trained to do so.**

i. Remain with the person, monitor breathing and pulse, and provide rescue breathing or provide CPR if needed, until he or she is under care of a medical professional, such as a physician, nurse, or EMS.

j. Watch the person closely. If the person does not respond by waking up, to voice or touch, or breathing normally, another dose may be given. NARCAN Nasal Spray may be dosed every 2 to 3 minutes, if available, until the person responds or emergency medical help is received.

## B.  NALOXONE VIA AUTO INJECTOR

### *Eligible Persons should be provided with the following:*

**1. EVZIO (naloxone hydrochloride injection, USP)**

a.  Two EVZIO (naloxone hydrochloride injection, USP) 0.4 mg auto-injectors or two 2.0 mg auto-injectors

b.  A single Trainer for EVZIO

c.  Patient instructions

### *Instructions for use:*

**1.  EVZIO (naloxone hydrochloride injection, USP)**

a.  Prepare device

   i. For EVZIO®

      1.  Pull off the Red safety guard. Note: The Red safety guard is made to fit tightly. Pull firmly to remove. To reduce the chance of an accidental injection, do not touch the Black base of the auto-injector, which is where the needle comes out.

b.  Hold injector with a fisted hand if possible and press firmly against outer thigh, until you hear a click or hiss. EVZIO® can be used through clothing. One auto injector delivers 0.4 mg or 2.0 mg naloxone.

c.  Continue to hold pressure for a full 10 seconds to ensure full delivery of medication. Note: The needle will inject and then retract back up into the EVZIO® auto-injector and is not visible after use. Do not look for the needle as this will put you at risk for needle stick injury.

d.  Continue to monitor breathing and pulse. If not breathing, give rescue breathing. If no pulse, start CPR, if able and trained to do so.

e.  If no response in 3-5 minutes, repeat the above instruction with a new autoinjection device.

   f.  Remain with the person, monitor and support breathing until he or she is under the care of a medical professional, such as a physician, nurse, or EMS.

## C. REFILLS

Refills may be obtained as needed under this standing order.

## VII.  CONTRADICTIONS

Do not administer Naloxone to a person with known hypersensitivity to Naloxone or to any of the other ingredients contained in the packaging insert for Naloxone.

## VIII.  PRECAUTIONS

### A.  DRUG DEPENDENCE

Persons who may be chronically taking opioids are more likely to experience adverse reactions from Naloxone. (See adverse reactions under section X below). Additionally, after administration, they may awaken disoriented. Being disoriented can sometimes lead to combative behavior, especially if Naloxone is given by someone unfamiliar.

### B.  RESPIRATORY DEPRESSION DUE TO OTHER DRUGS

Naloxone is not effective against respiratory depression due to non-opioid drugs. Initiate rescue breathing or CPR as indicated, if trained and able to do so, and contact 911.

### C.  PAIN CRISIS

In patients taking an opioid medication for a painful illness such as cancer, administration of Naloxone can cause a pain crisis, which is an intense increase in the experience of pain as the Naloxone neutralizes the pain-relieving effect of the opioid medication. Comfort the patient as much as possible and contact 911 as the patient may need advanced medical treatment to ease the pain crisis.

## IX.  USE IN PREGNANCY (Teratogenic Effects: Pregnancy Category C)

Based on animal studies, no definitive evidence of birth defects in pregnant or nursing women exists to date. There also have not been adequate studies in humans to make a determination.

## X. ADVERSE REACTIONS

### A. OPIOID DEPRESSION

Abrupt reversal of opioid depression may result in nausea, vomiting, sweating, abnormal heart beats, fluid development in the lungs and opioid acute withdrawal syndrome (see part B below), increased blood pressure, shaking, shivering, seizures and hot flashes.

**B. OPIOID DEPENDENCE**

Abrupt reversal of opioid effects in persons who are physically dependent on opioids may cause an acute withdrawal syndrome.

Acute withdrawal syndrome may include, but not be limited to, the following signs and symptoms: body aches, fever, sweating, runny nose, sneezing, yawning, weakness, shivering or trembling, nervousness or irritability, diarrhea, nausea or vomiting, abdominal cramps, increased blood pressure, and fast heart beats.

Most often the symptoms of opioid depression and acute withdrawal syndrome are uncomfortable, but sometimes can be severe enough to require advanced medical attention.

# EXHIBIT C

 **PHILADELPHIA POLICE DEPARTMENT      DIRECTIVE 4.22**

| Issued Date: 02-06-15 | Effective Date: 02-06-15 | Updated Date: 6-16-16 |
|---|---|---|

**SUBJECT:   NALOXONE ADMINISTRATION PROGRAM**

---

1. **PURPOSE**

   A. The purpose of this policy is to establish broad guidelines and regulations governing the utilization of Naloxone by trained personnel within the Philadelphia Police Department.  The objective is to treat and reduce injuries and fatalities due to opioid-involved overdoses when law enforcement is the first to arrive at the scene of a suspected overdose.

---

2. **POLICY**

   A. Law enforcement personnel may possess and administer Naloxone so long as they have completed training under the Pennsylvania Controlled Substance, Drug, Device and Cosmetic Act §780-113.8(A)(2) or who have received the training under subsection (A)(3) of said Act to administer Naloxone to an individual undergoing or believed to be undergoing an opioid-related drug overdose.

---

3. **DEFINITIONS**

   A. **Opioid**:     A medication or drug that is derived from the opium poppy or that mimics the effect of an opiate.  Opiate drugs are narcotic sedatives that depress activity of the central nervous system; these will reduce pain, induce sleep, and in overdose, will cause people to stop breathing.  First responders often encounter opiates in the form of morphine, methadone, codeine, heroin, fentanyl, oxycodone, and hydrocodone.

   B. **Naloxone**:   A prescription medication that can be used to reverse the effects of an opiate overdose.  Specifically, it displaces opioids from the receptors in the brain that control the central nervous and respiratory system.  It is marketed under various trademarks, including Narcan®.

   C. **Overdose Rescue Kit**:  At a minimum should include the following:

      1. Two (2) mL Luer-Jet luer-lock syringes prefilled with Naloxone (concentration 1mg/mL).

**DIRECTIVE 4.22 - 1**

2. Two (2) mucosal atomization devices (MAD).

3. One pair of medical glove.

4. Information pamphlet with overdose prevention information and step-by-step instruction for overdose responses and Naloxone administration.

---

4. **PROCEDURES**

   A. Deployment:

      1. The Chief Inspector, Training and Education Services shall be the Departmental Coordinator for the Naloxone administrative program.  Responsibilities will include:

         a. Coordinating and implementing the initial, state-mandated training for personnel participating in the Naloxone program and all refresher training required by policy.

         b. Maintaining training records for personnel.

         c. Requisitioning from Fire Department Emergency Medical Services the necessary Naloxone medication, reserve supplies and Overdose Rescue Kits.

         d. Implementing the proper inventory controls and safeguards for Naloxone issued to the PPD.

         e. Ensuring that Naloxone issued to officers or held in reserve are regularly and routinely rotated back to the Fire Department Emergency Medical Services Director for one (1) year prior to the expiration date of the prescription.

            **NOTE:** This will allow the available, unused Naloxone to be redistributed to medic units that more regularly and frequently use the prescription medication prior to it expiring.

         f. Maintaining administrative records regarding the Departmental use of Naloxone and disseminating these records to the Fire Department Emergency Medical Services Director pursuant to the attached Memorandum of Understanding.

      2. The Philadelphia Police Department shall ensure that officers chosen to participate in the Naloxone Program are trained in the use of Naloxone and are currently certified in both CPR and First Aid as required by the Municipal Police Officer Education and Training Commissioner and the attached Memorandum of Understanding.

**DIRECTIVE 4.22 - 2**

3. Refresher training in the use of Naloxone shall occur bi-annually and consist of familiarity with the assembly of the Overdose Rescue Kit and the effective administration and maintenance of Naloxone.

B. Naloxone Use:

1. Officers will request a Medic Unit to respond to any scene where the complainant is in a potential overdose state.

2. Officers should use universal precautions and protections from blood borne pathogens and communicable diseases when administering Naloxone. (Refer to Directive 3.15, "Handling Exposure to Communicable Diseases").

3. Officers will determine the need for treatment with Naloxone by evaluating the complainant: if the complainant is unresponsive with decreased or absent respirations they should administer Naloxone following the established training guidelines.

4. Once the assessment of the complainant is complete; which should include, but may not be limited to determining unresponsiveness and other indicators of opioid overdose, the officer will administer the medication from the Overdose Rescue Kit following the established training guidelines.

5. Officers will use proper tactics when administering Naloxone; complainants who are revived from an opioid overdose may regain consciousness in an agitated and combative state and may exhibit symptoms associated with withdrawal.

6. Officers will remain with the complainant until Fire Rescue personnel arrive. (Refer to Directive 3.14, "Hospital Cases") .32

7. Officers will inform Fire Rescue personnel upon their arrival that Naloxone has been administered.

8. Officers will complete a Naloxone administration form and submit it to the Chief Inspector, Training and Education Services/Naloxone program Administrator.

*1     9. Officers will complete a 75-48 report, coded "3018 Hospital Case, Naloxone Administered by Police."

C. Maintenance/Replacement of Naloxone:

1. Overdose Rescue Kits will be carried in a manner consistent with proper storage guidelines for temperature and sunlight exposure.

**DIRECTIVE 4.22 - 3**

2.  Used, lost, damaged or expired Overdose Rescue Kits will be replaced via a memorandum to the Chief Inspector, Training and Education Services.

3.  Expired Naloxone will be:

   a.  Maintained by the department for use in training; or

   b.  Properly documented and disposed of by the Training and Education Bureau.

| RELATED PROCEDURES | Directive 3.14, | Hospital Cases |
|---|---|---|
| | Directive 3.15, | Handling Exposure to Communicable Diseases |

## BY COMMAND OF THE POLICE COMMISSIONER

| FOOTNOTE | GENERAL # | DATE SENT | REMARKS |
|---|---|---|---|
| *1 | 4060 | 06-16-16 | Addition |

# Philadelphia Police Department
# Naloxone Reporting Form

Officers Name:_____       Report Date: _____/____/_____

DC#: _____       Location of Occurrence_____

1.  When did the overdose occur? Date: ____/____/____   Approximate Time: _____

2.  Where did the overdose occur?          3. What gender did the person who overdosed appear?

    ☐ Residence                              ☐ Male
    ☐ Work facility                          ☐ Female
    ☐ Street
    ☐ Hotel/Motel
    ☐ Other  Explain_____

4.  What race was the person who overdosed?
    ☐ Caucasian/white
    ☐ African American/black
    ☐ Asian
    ☐ Hispanic/Latino
    ☐ American Indian
    ☐ Other

5.  How did you know that an overdose was happening? (Check all that apply.)

    ☐ Person looked blue
    ☐ Person wouldn't wake up
    ☐ Person stopped breathing
    ☐ No response to sternal rub or painful stimuli
    ☐ Other  Explain_____

6.  What drugs were involved in the overdose? (Present at scene or suspected.  Check all that apply)

    ☐ Heroin              ☐ Alcohol
    ☐ Codeine             ☐ Meth
    ☐ Morphine            ☐ GHB
    ☐ Fentanyl            ☐ Cocaine/Crack
    ☐ Oxycodone           ☐ Benzodiazepines, 'benzos' (eg: valium)
    ☐ Methadone
    ☐ Other_____

7. Did the person who you administered Naloxone to:
   a) Experience any symptoms of withdrawal?    ☐None    ☐Mild    ☐Severe

   b) Display aggression because of these symptoms?    ☐Yes    ☐No

8. How long did it take for the Naloxone to work?  (Check one answer)

   ☐ Immediately    ☐ 30 seconds    ☐ One minute        ☐ 90 seconds
   ☐ 2 minutes      ☐ 3 minutes     ☐ more than 3 minutes    ☐ didn't work

9. How many vials of Naloxone were administered?

   ☐ 1         ☐ 2

10. Did the person survive the overdose?

   ☐ Yes    ☐ No    ☐ I don't know

11. Do you experience any problems carrying your Naloxone kit?

   ☐ Yes ☐ No      If yes, please specify:_____

Please forward the completed form to the Chief Inspector, Training and Education Services/ Police Department Naloxone Coordinator and receive a new kit.

# EXHIBIT D



# Pennsylvania Statewide

# Basic Life Support Protocols

## Pennsylvania Department of Health
## Bureau of Emergency Medical Services

### 2019


**pennsylvania**
DEPARTMENT OF HEALTH

(717) 787-8740

July 1, 2019

Dear EMS Provider:

The Bureau of EMS, Department of Health, is pleased to provide these updated "Statewide BLS Protocols" to the EMS providers of Pennsylvania.

This 2019 update contain many important changes, but some of the highlights include:

- the DMIST program to standardize the verbal report from EMS to receiving hospital personnel.
- an optional module for delivery of bronchodilator medication by nebulizer by EMT's.
- optional use of an 12-lead ECG device to obtain an electrocardiogram and transmit it for interpretation, when a system has the required capabilities.
- changes to encourage improved high-performance CPR and more care before transport of patients with cardiac arrest to improve outcomes.
- updates to align our protocols with the recently released National Scope of Practice Model. Fortunately, Pennsylvania has already adopted the majority of the enhancements within this new national scope of practice.

Pennsylvania has used Statewide BLS Protocols since Sept. 1, 2004, and this edition is an update to the version that was posted since June 10, 2017.  To assist EMS providers when reviewing the changes, new sections of the protocols that correspond to this 2019 version are identified with yellow highlighting and sections that have been removed are struck through and highlighted. EMS providers may use this 2019 version of the statewide BLS protocols as soon as they are familiar with the changes, but all providers must be using these updated protocols by the effective date of Sept. 1, 2019.

EMS providers are permitted to perform patient care, within their Pa. defined scope of practice, when following the appropriate protocol(s) or when following the order of a medical command physician. Each EMS provider is responsible for being knowledgeable regarding current state-approved protocols so that he/she may provide the safest, highest quality and most effective care to patients.

To assist providers in becoming familiar with the changes to the protocols, a continuing education presentation is available to regions and agencies. This update is available for in-person presentations or the course can be completed on TRAIN PA, the on-line Learning Management System (LMS). **The 2019 BLS Protocol Update (BEMS course #1000022407 will be considered a core requirement for all levels of EMS providers**

**that register their certification during the current time period. Furthermore, the completion of this course should be used by EMS agencies when ensuring that the agency's providers have been educated to the current protocols.**

When providing patient care under the EMS Act, EMS providers of all levels must follow applicable protocols.  Although the Statewide BLS Protocols are written for BLS-level care, they also apply to the BLS-level care that is performed by all providers at or above the level of AEMT.  Since written protocols cannot feasibly address all patient care situations that may develop, the Department expects EMS providers to use their training and judgment regarding any protocol-driven care that would be harmful to a patient.  **When the practitioner believes that following a protocol is <u>not</u> in the best interest of the patient, the EMS practitioner should contact a medical command physician if possible.**  Cases where deviation from the protocol is justified are rare.  The reason for any deviation should be documented.  All deviations are subject to investigation to determine whether or not they were appropriate.  In all cases, EMS providers are expected to deliver care within the scope of practice for their level of certification.

The Department of Health's Bureau of EMS website will always contain the most current version of the EMS protocols, the scope of practice for each level of provider, important EMS Information Bulletins, and many other helpful resources. This information can be accessed online at www.health.pa.gov  The Statewide BLS Protocols may be directly printed or downloaded into a mobile device for easy reference.

The Department is committed to providing Pennsylvania's EMS providers with the most up-to-date protocols, and to do this requires periodic updates.  The protocols will be reviewed regularly, and EMS providers are encouraged to provide recommendations for improvement at any time.  Comments should be directed to the Commonwealth EMS Medical Director, Pennsylvania Department of Health, Bureau of EMS, 1310 Elmerton Avenue**,** Harrisburg, PA 17110.

Dylan Ferguson
Director
Bureau of Emergency Medical Services
Pennsylvania Department of Health

Douglas F. Kupas, MD, EMT-P**,** FAEMS
Commonwealth EMS Medical Director
Bureau of Emergency Medical Services
Pennsylvania Department of Health

Pennsylvania Department of Health          Behavioral & Poisoning          801 – BLS – Adult/Peds

**Procedure for patients that require physical restraint:**

    **A. All Patients:**

      1. Use the minimum amount of restraint necessary to safely accomplish patient care and transportation with regard to the patient's dignity.

      2. Assure that adequate personnel are present and that police assistance has arrived, if available, before attempts to restrain patient.

      3. Call for ALS, if available, if patient continues to struggle against restraint.[2]

      4. Restrain all 4 extremities with patient supine on stretcher.[3,4,5,6]

      5. Use soft restraints to prevent the patient from injuring him or herself or others.[7]

         a. If the handcuffs or law enforcement devices are used to restrain the patient, a law enforcement officer should accompany the patient in the ambulance

         b. It is preferable that a law enforcement officer follows the ambulance in a patrol car to the receiving facility if physical restraint is necessary.

      6. Do not place restraints in a manner that may interfere with evaluation and treatment of the patient or in any way that may compromise patient's respiratory effort.[8]

      7. If the patient is spitting, may cover his/her face with a surgical mask or with a NRB mask with high flow oxygen.[9]

      8. Evaluate circulation to the extremities frequently.

      9. Thoroughly document reasons for restraining the patient, the restraint method used, and results of frequent reassessment.

**Possible Medical Command Orders:**

    **A.** Medical command may order restraint and transport of a patient against his/her will.

**Notes:**

    1. Verbal techniques include:

      a. Direct empathetic and calm voice.

      b. Present clear limits and options.

      c. Respect personal space.

      d. Avoid direct eye contact.

      e. Non-confrontational posture.

    2. There is a risk of serious complications or death if patient continues to struggle violently against restraints. Sedation by ALS providers may be indicated in some circumstances as directed by ALS protocols or by order from medical command physician.

    3. Initial "take down" may be done in a prone position to decrease the patient's visual field and ability to bite, punch, and kick. After the individual is controlled, he/she should be restrained to the stretcher or other transport device in the supine position.

    4. **DO NOT restrain patient in a hog-tied or prone position.**

    5. **DO NOT** sandwich patient between devices, such as long boards or Reeve's stretchers, for transport. Avoid restraint to unpadded devices like backboards.

    6. A stretcher strap that fits snuggly just above the knees is effective in decreasing the patient's ability to kick.

    7. Padded or leather wrist or ankle straps are appropriate. Handcuffs and plastic ties are not considered soft restraints.

    8. Never apply restraints near the patient's neck or apply restraints or pressure in a fashion that restricts the patient's respiratory effort.

    9. Never cover a patient's mouth of nose except with a surgical mask or a NRB mask with high flow oxygen. A NRB mask with high flow oxygen may be used to prevent spitting in a patient that also may have hypoxia or another medical condition causing his/her agitation, but a NRB mask should never be used to prevent spitting without also administering high flow oxygen through the mask.

**Performance Parameters:**

    **A.** Review for documentation of reason for restraint and restraint method used. Consider reviewing every call when physical restraint is used.

    **B.** Hospital-operated EMS agencies may have additional JCAHO requirements for documentation.

    **C.** Review for documentation of frequent reassessment of vital signs, cardiopulmonary status, and neurovascular status of restrained extremities. Consider benchmark of documenting these items at least every 15 minutes.

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| JONATHON O. DOWD, as father and administrator of the estate of JONATHON B. DOWD, deceased, | : | |
| Plaintiff, | : | Civil Action No.: 2:21-CV-01945 |
| | : | |
| v. | : | |
| | : | JURY TRIAL DEMANDED |
| CITY OF PHILADELPHIA; OFFICER DANIEL MITCHELL, individually; OFFICER LINDSAY MOORE, individually; SIMON CHERNOV, individually, AND BERNARD BAKER, individually. | : | ELECTRONICALLY FILED |
| Defendants | : | |

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document has been served on the following by the Court's ECF filing system.

Andrew Pomager, Esq.
Assistant City Solicitor
Philadelphia Law Department
1515 Arch Street, 14th Floor
Philadelphia, PA 19102
215-341-3432
andrew.pomager@phila.gov

Dated: July 14, 2021

/s/ *Scott P. Stedjan*
Scott P. Stedjan, Esquire
Pa. I.D. # 318851
Killian & Gephart, LLP
218 Pine Street,
Harrisburg, PA 17101
sstedjan@killiangephart.com
Tel: (717) 232-1851
Fax: (717) 238-0592
*Counsel for Plaintiff*